IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

PHIL OTIS CROSS                                                           PLAINTIFF

            v.                         Civil No. 05-4009

H.L. PHILLIPS, Sheriff, Miller
County, Arkansas; NURSE TERRY
PORTER; and JEFF BLACK, Warden
Miller County Correctional Center                                        DEFENDANTS

## MEMORANDUM OPINION

Before the court for decision is the defendants' motion for summary judgment (Doc. 49).

To assist plaintiff in responding to the summary judgment motion, a questionnaire was

propounded to the plaintiff (Doc. 54). Plaintiff's response to the questionnaire was filed as his

response to the summary judgment motion (Doc. 55).

## BACKGROUND

Phil Otis Cross was booked into the Miller County Detention Center (MCDC) on June

18, 2004. *Plaintiff's Response* (Doc. 55) (hereinafter *Resp.*) at ¶ 1. He was being held on

pending criminal charges. *Id.* at ¶ 2. His probation was revoked six months later. *Id.* at ¶ 3(A).

He remained incarcerated at the MCDC until March of 2005.[1] *Id.*

At all times relevant to this case, Terry Porter was employed as the jail nurse for the

MCDC. *Resp.* at ¶ 4; *Defendants' Exhibit* (hereinafter *Defts' Ex.*) C at ¶ 1. To see the jail nurse

at the MCDC, inmates are required to submit written requests or sick call slips. *Resp.* at ¶ 7.

---

[1]Defendants indicate Cross was seen by a dentist on March 9, 2005, *Defts' Ex.* C at ¶ 26. Cross states he was transferred to the Arkansas Department of Correction (ADC) shortly after the appointment, *Resp.* at ¶ 44. Nothing before the court establishes the day of the transfer of Cross to the ADC.

On June 25, 2004, Cross was seen by Nurse Porter for the first time. *Defts' Ex.* C at ¶ 2. Cross told Nurse Porter that he had seizures. *Id.* Cross told Nurse Porter that he had been going to the emergency room to obtain his medication and that he had been out of medication for about two weeks. *Resp.* at ¶ 6; *Defts' Ex.* C at ¶ 3.

Cross did not bring his medication with him to the jail. *Resp.* at ¶ 8. Cross indicates he did not know he was going to be arrested. *Id.* Further, Cross states the tension of being arrested caused him to have more frequent seizures. *Id.*

According to Cross, it took him thirty days to get any medication from Nurse Porter. *Resp.* at ¶ 5. Moreover, he states inmates had to put in at least three sick call requests before Nurse Porter thought you were serious enough to warrant a visit. *Id.* at ¶¶ 5 & 7.

On June 25, 2004, Cross signed a release for St. Michael's Hospital and was placed in a holding cell to be monitored until Nurse Porter could verify the medications he stated he was on for possible seizures. *Resp.* at ¶ 9; *Defts' Ex.* C at ¶ 3. Officers were instructed to monitor Cross for possible seizure activity and notify the nurse in the event of such activity. *Defts' Ex.* C at ¶ 4.

On June 25, 2004, the MCDC received Cross' medical records from St. Michael's Hospital for 2001, the last time he had been seen there. *Defts' Ex.* C at ¶ 4. No medication for seizures had been prescribed. *Id.* The records indicated Cross' CT (computerized tomography) and ECG (electroencephalogram) were within normal limits. *Defts' Ex.* C at ¶ 4. The discharge summary indicated Cross was to stay away from drugs and ETOH (ethanol). *Id.* None of the information received indicated seizure medication was prescribed. *Id.*

-2-

On June 29, 2004, Nurse Porter told Cross that the information they received had not shown he was taking seizure medication. *Defts' Ex.* D; *Resp.* at ¶ 13. She stated that if and when a bottom bunk became open Cross could take it. *Id.* Otherwise she stated the best place for Cross was to stay on the floor since he claimed to have seizures. *Id.* She stated that Cross would only be monitored unless he could produce some information verifying that he had been on medication. *Id.* She stated he could have Tylenol or Ibuprofen for pain. *Id.*

On July 1, 2004, Cross submitted a sick call request to Nurse Porter. *Defts' Ex.* C at ¶ 5. He stated that she had not done anything to obtain his medical records. *Id.* Cross stated that if he could go to Wadley Hospital and Albertsons, he would be able to get his medication. *Id.* Nurse Porter had Cross complete a release of records and provide her with the phone number of the Albertsons where he stated he had his medication filled. *Resp.* at ¶ 15.

Nurse Porter contacted Albertsons and they told Nurse Porter they had not filled any prescriptions for Cross since January 10, 2003. *Defts' Ex.* C at ¶ 5. Albertsons advised Nurse Porter that Cross had never filled a prescription for seizure medication there. *Id.*

Cross maintains the problem is not whether he had seizures before he got to the MCDC. *Resp.* at ¶ 10 & ¶ 13. Instead, he contends the issue is whether he got proper medical care while he was in the MCDC. *Id.* He maintains Nurse Porter didn't even refer him to the jail doctor, Dr. Stringfellow. *Id.* at ¶ 16. If the MCDC could not provide him with proper treatment, Cross maintains he should have been sent where he could get treatment. *Id.* at ¶ 14.

On July 13, 2004, Cross was seen by Dr. Stringfellow and he chose to put Cross on Dilantin 100 mg., three times a day. *Resp.* at ¶ 17. Dr. Stringfellow also prescribed Cross Naprosyn, 500 mg., twice a day, for arthritis pain. *Id.*

-3-

According to Cross, Dr. Stringfellow was very cooperative and nice. *Resp.* at ¶ 17. Cross indicates Dr. Stringfellow remembered Cross from a previous visit when Cross needed medication. *Id.*

On August 17, 2004, Cross was sent to Wadley Hospital by the sergeant on duty. *Defts' Ex.* C at ¶ 7. He was diagnosed with sinusitis and given a prescription for Amoxicillin, an antibiotic. *Id.*

On October 4, 2004, Cross was observed having a seizure that lasted approximately five minutes. *Defts' Ex.* C at ¶ 8. As a result of the seizure, he suffered a small cut on his tongue but had no other injuries. *Id.*

Dr. Stringfellow was contacted for permission to draw blood immediately to determine the Dilantin level in Cross' blood. *Resp.* at ¶ 20. The lab report was received that same day showing the Dilantin level was low. *Id.* at ¶ 21. Dr. Stringfellow gave orders for Cross to be given Dilantin 300 mg., twice on that day, and then to start Dilantin 200 mg., twice a day. *Id.* Cross' Dilantin level was to be re-checked in one week. *Id.*

On October 8, 2004, Cross was seen by Dr. Stringfellow. *Resp.* at ¶ 22. He was complaining of flu-like symptoms. *Id.* Dr. Stringfellow prescribed Amoxicillin for ten days and instructed Cross to increase his fluids. *Id.*

On October 16, 2004, Cross complained of spicy foods making him sick. *Defts' Ex.* C at ¶ 12. A dietary change was made requesting that Cross be served a peanut butter tray when spicy foods were served. *Id.*

On October 20, 2004, Cross' blood was drawn to check his Dilantin level. *Resp.* at ¶ 24. It was 4.1 which is low. *Id.* On October 26, 2004, Dr. Stringfellow ordered an increase of

-4-

Cross' Dilantin to 200 mg. each morning and 300 mg. each night with the level in his blood to be re-checked in a week. *Id.* at ¶ 25.

On October 29, 2004, Cross was seen by Nurse Porter complaining of cold symptoms. Nurse Porter ordered "CTM's[2]" one to three times a day as well as Tylenol one to three times a day. *Resp.* at ¶ 26. Cross was instructed to return if the symptoms did not resolve. *Id.* Cross states by the time he was treated Nurse Porter had "enough time to realize" he was really sick. *Id.* He maintains it took three sick call request forms before you even heard from her. *Id.*

On October 29, 2004, Cross complained that he was having seizures and nothing was being done about it. *Resp.* at ¶ 28. He stated he was not getting his medication and was not being cared for properly. *Id.* Cross states that during one period of time, while he was in the general population with other inmates, Nurse Porter would not give him medication. *Id.* Moreover, Cross asserts there was a period of over thirty days, before Dr. Stringfellow saw Cross, that Dr. Stringfellow was unaware Cross was in the MCDC. *Id.*

According to defendants, Cross was moved to a holding cell so that he could be monitored on a closer basis. *Defts' Ex.* C at ¶ 16. According to Cross, he was moved to the holding cell because Nurse Porter got tired of the other inmates pushing the intercom when Cross would have a seizure. *Resp.* at ¶ 29. Cross maintains he was not observed more closely, did not receive his medication on time, and was frequently told by an officer that he would be right back and then Cross would never see the officer again. *Id.*

On November 1, 2004, Nurse Porter noted that the officers had reported no seizure activity since Cross had been moved to the holding cell. *Defts' Ex.* E. Cross maintains Nurse

---

[2]Nothing in the record indicates what "CTM's" are.

Porter would not know if he was having a seizure in the holding cell because there were no inmates to push the intercom button if he had a seizure. *Resp.* at ¶ 30.

On November 16, 2004, Nurse Porter received a request from Cross asking that his blood sugar be tested. *Resp.* at ¶ 31. It was 86 which is within normal limits. *Id.* At the time, Cross was complaining of night sweats, coughing, and fatigue. *Id.* Cross was given a tuberculosis (TB) skin test. *Id.*

On November 18, 2004, Cross' TB skin test was checked and it showed 20 mm. *Resp.* at ¶ 32. A telephone order was received from Dr. Stringfellow for a chest x-ray. *Id.*

On or about the weekend of December 20, 2004, during a shake down of the pods, in excess of 60 Dilantin pills were found in Cross' possession. *Defts' Ex.* C at ¶ 19. Officers confiscated the medication. *Id.*

Cross indicates he does not know how many pills were seized from him. *Resp.* at ¶ 33. Cross states Nurse Porter would not give him seizure medication so the other inmates started to give him some of theirs. *Id.*

Dr. Stringfellow was notified. *Defts' Ex.* C at ¶ 19. As a result of the medication being found in Cross' possession, when he was given his medication he was made to open his mouth and lift his tongue after he took the medication to make sure he swallowed it. *Resp.* at ¶ 35.

On December 31, 2004, Dr. Stringfellow saw Cross regarding his TB skin test. *Defts' Ex.* C at ¶ 20. Through conversation with Cross, it was determined that he had tested positive sometime in the 1970's and had taken medication. *Id.* Dr. Stringfellow did not recommend any type of medication. *Id.*

-6-

On January 17, 2005, Nurse Porter received a sick call from Cross requesting medication for hemorrhoids. *Defts' Ex.* C at ¶ 21. Hemorrhoid cream was given to Cross on January 18, 2005. *Id.*

On January 21, 2005, Cross complained of an upset stomach and was given Pepto Bismol and monitored. *Resp.* at ¶ 38. On January 24, 2005, Cross complained of a toothache and stated he had a seizure and bit his tongue and broke his tooth. *Defts' Ex.* C at ¶ 23. He was given Ibuprofen three times a day and, in between, Naprosyn for the toothache. *Id.* He was told an appointment would be made with a dentist. *Id.* No antibiotic was given as it did not appear there was any infection. *Id.* Officers stated that Cross had not had a seizure during their shifts over the weekend. *Id.* at ¶ 23.

Cross indicates he had to submit three or four sick call slips before Nurse Porter saw him. *Resp.* at ¶ 39. He indicates he finally had the tooth pulled the day before he was moved to the Arkansas Department of Correction (ADC). *Id.*

On January 27, 2005, Cross "threw a fit" because he had not gone to a dentist. *Defts' Ex.* C at ¶ 24. He was advised that it took time to schedule inmates for appointments. *Id.* He was given some more Ibuprofen and some CMT's because he also complained his sinuses were bothering him. *Id.*

On February 24, 2005, Nurse Porter received a sick call slip from Cross dated February 20th complaining of a seizure and a toothache. *Defts' Ex.* C at ¶ 25. No seizures had been observed by the officers. *Id.* Cross was given Ibuprofen for the toothache. *Id.* Cross was informed that a dental appointment had been scheduled within the next couple of weeks. *Id.*

AO72A
(Rev. 8/82)

According to Cross, the officers never observe seizures. *Resp.* at ¶ 42.  Instead, Cross states another inmate usually calls an officer when you are unconscious. *Id.*

On March 9, 2005, Cross was seen by Dr. Curry for dental work. *Defts' Ex.* C at ¶ 26. Dental work was done and Cross was placed on an antibiotic and Ibuprofen. *Id.*  Shortly after seeing the dentist, Cross was transferred to the ADC. *Resp.* at ¶ 44.

For a period of time while he was at the MCDC, Cross was placed in the medical pod. *Defts' Ex.* F at ¶ 3.  The medical pod is strictly for inmates who are on medication. *Id.*

Cross maintains he was placed in this pod as punishment for having seizures. *Resp.* at ¶ 45.  While in this pod, Cross maintains he could not be observed while having a seizure. *Id.* Cross states they did not have to bother with him when he was there. *Id.*  He indicates jailers would not see what he wanted or would say they would be right back and not come back. *Id.*

Jeff Black was the warden of the MCDC during Cross' incarceration there. *Resp.* at ¶ 46. According to Black, after Cross complained that he was not receiving his medication as required and was being threatened, he was moved to a holding cell so that he could be monitored. *Defts' Ex.* F at ¶ 4.  Cross states he was never threatened. *Resp.* at ¶ 47.  He indicates other inmates helped him when he was sick. *Id.*  Cross does state officers frequently threatened you if they had to get "off of their behinds" to see what you wanted. *Id.*

The holding cell was approximately eight foot by ten foot in size. *Resp.* at ¶ 50.  After one week, Cross had a mat to sleep on. *Id.*  There was a toilet in the cell. *Id.*  He received three meals a day. *Id.*  For four months, Cross indicates he was not allowed out of the cell. *Id.*  He could receive legal and personal mail. *Id.*  He did not have access to a day-room, telephone, television, books, magazines, or radio. *Id.*  He could exercise in the cell if he had been physically able. *Id.*

-8-

Although Cross states there were times when he did not have access to his medication for two or three days in a row, *id.,* in response to another question he indicates he received his medication after he was taken to see Dr. Stringfellow on July 13, 2004, *resp.* at ¶ 52.

Cross spent the last four months at the MCDC from December of 2004 through March of 2005 assigned to the holding cell. *Resp.* at ¶ 51.     All decisions regarding Cross' medical care were made by Nurse Porter or Dr. Stringfellow. *Resp.* at ¶ 53. However, Cross states Nurse Porter decided if she wanted Dr. Stringfellow's opinion. *Id.*

Cross did not personally speak to Sheriff Phillips regarding Cross' need for medical care. *Resp.* at ¶ 54. However, Cross maintains he wrote three or four requests to see Sheriff Phillips. *Id.* Cross was told that Sheriff Phillips chooses not to see anyone. *Id.* Cross believes Sheriff Phillips exhibited deliberate indifference to Cross' medical needs by not caring enough about his medical needs to respond to his requests. *Id.*

After Cross came back from a trip to the hospital, he indicates Jeff Black came to the holding cell and told Cross that unless Black saw some blood Cross would not be going to the hospital again. *Resp.* at ¶ 55. Cross states Black did not believe there was anything wrong with Cross. *Id.*

The decision to place Cross in the holding cell was made by Nurse Porter. *Resp.* at ¶ 57. Cross maintains she made this decision to punish him for having seizures and to get him to a place where she didn't have to be bothered with him. *Id.* While he was in the general population, Cross states the other inmates could use the intercom button to call Nurse Porter when he was unconscious. *Id.*

-9-

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## DISCUSSION

As noted above, Cross was incarcerated at the MCDC from June 18, 2004, until March of 2005. *Resp.* at ¶ 1 & ¶ 3(A). According to Cross, for the first six months he was a pretrial detainee. *Resp.* at ¶ 2 & ¶ 3(B). Although the denial of medical care claims brought by pretrial detainees are more properly analyzed under the Due Process Clause of the Fourteenth Amendment than the Eighth Amendment, *Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004), the Eighth Circuit has held that deliberate indifference is the "appropriate standard of culpability for

-10-

all claims that prison officials failed to provide pretrial detainees with adequate . . . medical care,"

*Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

     "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

     "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

-11-

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Cross' claim is largely premised on the actions or inactions of Nurse Porter. Cross concedes that once he was seen by Dr. Stringfellow on July 13, 2004, Cross was prescribed seizure medication. *Resp.* at ¶ 17 & ¶ 52. Although Cross states there were times Nurse Porter would not give him his medication, Cross is referring to the initial period of incarceration at the MCDC prior to his first visit to Dr. Stringfellow. *See e.g., Resp.* at ¶ 5, ¶ 7, ¶ 16, ¶ 28. Cross believes Nurse Porter should have immediately scheduled him to see Dr. Stringfellow or immediately prescribed him seizure medication. *Id.*

The records establish Nurse Porter attempted to verify the fact that Cross was on some type of seizure medication. When Cross indicated he had been going to the emergency room to obtain his medication, she obtained a medical release from him and obtained the hospital records.

-12-

*Resp.* at ¶ 6, ¶ 9, ¶ 11; *Defts' Ex.* C at ¶ 4.  When the hospital records did nothing to verify that he was taking seizure medication, Nurse Porter notified Cross that he would only be monitored unless he could produce some information verifying that he had been on medication. *Resp.* at ¶ 13; *Defts' Ex.* D.

On July 1, 2004, Cross then advised Nurse Porter that if he could go to Wadley Hospital or Albertsons he could get his medications. *Defts' Ex.* C at ¶ 5.  Nurse Porter obtained a release of records from Cross and contacted Albertsons. *Resp.* at ¶ 14; *Defts' Ex.* C at ¶ 5.  Albertsons advised Nurse Porter that Cross had never filled any prescriptions for seizure medications there. *Defts' Ex.* C at ¶ 16.

Thereafter, on July 13, 2004, Cross was seen by Dr. Stringfellow and prescribed Dilantin. *Resp.* at ¶ 17.  Cross' Dilantin level was checked on October 4, 2004, and his medication adjusted. *Resp.* at ¶ 20 & ¶ 21.  On October 20, 2004, Cross' Dilantin level was checked again and on October 26th his medication was adjusted. *Resp.* at ¶ 24 & ¶ 26.

It is obvious from the undisputed facts that Cross was not denied medical attention.  Cross received medical attention on multiple occasions and his requests for medical treatment were evaluated by medical personnel.  Nurse Porter attempted to verify that Cross has some type of seizure disorder or had been prescribed seizure medication.  She followed-up with each medical source provided her by Cross.  None of the medical sources did anything to establish that he had been taking any type of seizure medication when he became incarcerated at the MCDC.  Cross brought no medication with him, did not provide any verifiable information regarding the

-13-

existence of a seizure disorder, and had not, up to that time, been observed having any seizures by MCDC personnel.

Cross received all medical care ordered by the medical personnel who treated him.  While Cross does not believe the treatment he received was adequate or that he was prescribed seizure medication quickly enough, a difference of opinion between Cross and the medical personnel who treated him regarding his treatment or the necessity of his being prescribed certain medication does not give rise to a § 1983 claim. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(mere disagreement with the course of medical treatment is insufficient to state an Eighth Amendment claim).  Moreover, Cross has presented no evidence that the delay in his receiving the prescription medication from June 18, 2004, until it was prescribed by Dr. Stringfellow on July 13, 2004, had any detrimental impact on his health.  *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)(inmate who complains about delay in medical treatment must present verifying medical evidence of detrimental effect of delay).  In fact, Cross was not taking the medication prior to his incarceration on a daily basis. *Resp.* at ¶ 6.  (was out of medication for two weeks prior to his incarceration).  We find there are no genuine issues of material fact as to whether Nurse Porter was deliberately indifferent to Cross' serious medical needs.

With respect to Sheriff Phillips and Jeff Black, "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts,* 909 F.2d 1203, 1208 (8th Cir. 1990).  In this case, there is no indication that either Sheriff Phillips or Jeff Black made any decisions regarding Cross' medical care or the medication he should be prescribed.  Instead, all treatment decisions, including the decision to move Cross to the holding

-14-

cell for observation, were made by Nurse Porter and/or Dr. Stringfellow. *See also Keeper v. King*,
130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence the defendants were medical personnel or were
personally involved in making medical decisions about the plaintiff's treatment); *Boyd v. Knox*,
47 F.3d 966, 968 (8th Cir. 1995)(section 1983 liability requires personal involvement, or
allegation that supervisor had knowledge of unconstitutional conduct and turned blind eye to it).

## CONCLUSION

For the reasons stated, the defendants' motion for summary judgment (Doc. 49) will be
granted.  A separate order in accordance with this opinion will be entered.

DATED this 17th day of January,  2007.

/s/ Jimm Larry Hendren
UNITED STATES DISTRICT JUDGE

-15-

AO72A
(Rev. 8/82)